United States District Court
for the
Southern District of Florida

Chernequa Dawson, Plaintiff,

v.

Cigna Corporation and Life
Insurance Company of North
America, Defendants.

)
)
)
)
)
)

Civil Action No. 16-23502-Civ-Scola

## Order on Cross-Motions for Summary Judgment

This matter is before the Court on the parties' cross motions for summary judgment (ECF Nos. 23, 25). For the reasons explained in this Order, the Plaintiff's Motion for Summary Judgment (ECF No. 25) is **denied**, and the Defendants' Motion for Summary Judgment (ECF No. 23) is **granted**.

## 1. Background

This is an ERISA benefits denial case. Chernequa Dawson is a former Care Transition Coordinator ("CTC") Nurse Care Manager for Cigna Corporation ("Cigna"). (Pl.'s Statement of Material Facts ¶ 1, ECF No. 26.) Cigna sponsors both a Short Term Disability Plan ("SD Plan") and a Long Term Disability Plan ("LD Plan") for its employees. (Def.'s Statement of Material Facts ¶ 1, ECF No. 24; Pl.'s Statement ¶ 2.) The LD Plan provides continuing income for employees whose covered disability lasts longer than the maximum SD Plan benefit period. (Def.'s Statement, ¶ 4.) Cigna pays the SD Plan benefits out of its general assets, while Life Insurance Company of North America ("LINA") insures the benefits under the LD Plan. (Def.'s Statement ¶¶ 3, 6.) LINA determines eligibility and benefit amounts under both the SD and LD Plans. (*Id.* ¶¶ 2, 5.) Dawson participated in both plans. (Pl.'s Statement, ¶ 2.)

The Summary Plan Description for the SD Plan states, in relevant part: "You have a covered disability . . . if, because of a medical condition related to an accident, illness or pregnancy:

- You are unable to perform the essential functions of your current or a similar role for at least six consecutive scheduled work days;

- The essential duties that you cannot perform cannot be reassigned to another person in order to accommodate your return to work;

- You cannot, based on your lack of work experience or on work restrictions related to your medical condition, be reassigned to another position within 15% of the market value of your current role; and

- Your physician provides objective medical evidence to support his or her assessment of your medical condition.

(Pl.'s Statement ¶ 4; Def.'s Statement ¶ 11.)

The LD Plan states, in relevant part, "The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative." (Pl.'s Statement ¶ 5.) An employee's ability to work under the LD Plan is based on: (1) medical evidence submitted by the employee; (2) consultation with the employee's physician; (3) evaluation of the employee's ability to work by not more than three independent experts if required by the insurance company; and (4) an offer of employment that meets the employee's capacity to do the work is made by the employer. (Admin. R. at 40, ECF No. 22-1.) Among other requirements, an employee must satisfy the "Elimination Period" before the employee is eligible to receive benefits. (*Id.* at 47.) The Elimination Period is defined as "the period of time an Employee must be continuously Disabled before Disability Benefits are payable." (*Id.*) The LD Plan states that the Elimination Period is the later of the date the 26th weekly benefit in any rolling 12-month period is payable under the SD Plan, or the date the employee's participation in an employer-approved transitional work arrangement ends. (*Id.* at 41.)

On July 10, 2014, Dawson was injured when a man in an electric wheelchair ran over her feet and pinned her against the wall of an elevator. (*Id.* ¶ 9.) Dawson subsequently had over fifty medical appointments with twelve different medical professionals during a one-year period. (Pl.'s Mot. for Summ. J. at 17.) Shortly after the incident, Dawson filed a claim for benefits under the SD Plan. (Pl.'s Statement ¶ 10.) There is no dispute that Dawson met the requirements to receive benefits under the SD Plan from July 11, 2014 through September 6, 2014, and that she did in fact receive benefits during that time period. (*Id.* ¶ 11; Def.'s Statement of Material Facts in Resp. to Pl.'s Mot. ¶ 11, ECF No. 29.)

By letter dated October 8, 2014, LINA denied Dawson's claim for benefits under the SD Plan effective September 6, 2014, finding that the "medical information on file did not provide evidence of a functional impairment restricting you from performing your every day job duties." (Pl.'s Statement ¶ 12; Def.'s Statement ¶ 14, ECF No. 24; Admin. R. at 488, ECF No. 22-1.) A claim manager, senior claim manager, nurse care manager, and medical director reviewed Dawson's claim. (Admin. R. at 488, ECF No. 22-1.)

The denial letter explained that Dr. Kiva Davis's notes from her July 21, 2014 examination of Dawson stated that the examination "was mostly within

normal limits, mild, [sic] limitation in your hips" and that Dawson was "voluntarily restricted. . .the range of motion in your knee was at 90 degrees, your reflexes were equal, there were no bruises, skin discoloration, or swelling." (*Id.*) Dr. Davis's notes from her September 2, 2014 examination stated that Dawson would not allow her to complete the exam due to pain. (*Id.*) On September 9, 2014, Dr. Davis stated that Dawson was not able to return to work until she had an orthopedic evaluation. (*Id.*) The letter noted that a nurse case manager had contacted Dr. Davis for clarification since Dawson's level of functional impairment was unclear. (*Id.*) The letter does not state whether the nurse case manager actually spoke with Dr. Davis. (*Id.*)

The Medical Director's review of Dawson's file found that "the provider's restrictions are not supported by any acceptable clinical or laboratory findings. The diagnostics were inconsistent with other substantial evidence in your claim file." (*Id.*) The letter concluded, "We acknowledge that you may have been experiencing symptoms related to your lower leg injury. However, the medical information received does not support how you are unable to perform your light occupation as a Nurse Case Manager beyond September 6, 2014." (*Id.*)

Dawson appealed LINA's decision. (Pl.'s Statement ¶ 13; Admin. R. at 418-421, ECF No. 22-2.) By letter dated January 21, 2015, LINA upheld its decision to deny Dawson's claim for benefits. (Pl.'s Statement ¶ 14.) An Appeal Senior Associate and a Medical Director reviewed Dawson's complete file. (Admin. R. at 477, ECF No. 22-1.) The letter noted that Dr. Davis's evaluations of Dawson on September 2, 2014 and October 2, 2014 were limited or could not be performed due to Dawson's pain. (*Id.*) The letter noted that Dawson had an orthopedic evaluation with Dr. Kenneth Berliner on October 10, 2014. (*Id.*) Dr. Berliner documented that Dawson had difficulty with ambulation, was using a cane, experienced tenderness of the lumbar spine, and had motor group test scores of 2-3 out of 5. (*Id.*) However, Dr. Berliner observed that Dawson's feet showed no scarring, swelling, or discoloration at the site of the injuries, and the x-rays that Dr. Berliner reviewed from the date of the accident showed no fractures or dislocations. (*Id.*) Dr. Berliner's report stated that he was unable to complete a reasonable examination at that time. (*Id.*)

The letter further noted that on October 14, 2014, Dawson had an evaluation with Dr. Kevin Prentice. (*Id.*) Dr. Prentice documented tenderness in Dawson's lower extremities, but his examination revealed "minimal strength deficits at 4/5" and no asymmetric or sensory deficits. (*Id.*) Dr. Prentice's examination was limited due to Dawson's complaints of pain. (*Id.*) The letter concluded that "There was no clinical evidence that would demonstrate a functional loss and inability to perform your occupation beyond September 6, 2014." (*Id.*)

Dawson filed a second appeal, which LINA denied by letter dated June 10, 2015. (*Id.* ¶¶ 15-16.) In support of her second appeal, Dawson provided the results of a Functional Capacity Evaluation ("FCE"), as well as updated medical records. (Pl.'s Mot. for Summ. J. at 4, ECF No. 25.) A Medical Director reviewed Dawson's complete file. (Admin. R. at 465, ECF No. 22-1.) The denial letter noted that the FCE was dated January 8, 2014, which was prior to Dawson's injuries. (*Id.*) The letter reviewed in detail the notes from Dawson's March 19, 2015 visit to Dr. Grover, the results of an April 2, 2015 MRI, and the notes from a March 23, 2015 rheumatology consultation with Dr. Peer. (*Id.*) The letter noted that Dr. Grover documented some decreased sensation, range of motion, and tenderness in Dawson's back, and tenderness, decreased range of motion and strength in Dawson's knees, among other things. (*Id.*) Dr. Peer noted that Dawson's February 25, 2015 laboratory results were "unremarkable" and observed Dawson to be in "mild distress." (*Id.*) Dr. Peer noted a decreased range of motion in Dawson's spine, and "diffuse tenderness of muscles and joints." (*Id.*) He diagnosed Dawson with "fibromyalgia, chronic pain syndrome, chronic pain due to trauma and long-term use of NSAIDs." (*Id.*) Dr. Peer adjusted Dawson's medications and advised her "to get plenty of sleep and do aerobic exercises." (*Id.*) The denial letter concluded that, although there were some positive findings in the doctors' examinations, "there are no documented measured loss [sic] of ability to perform the duties of you [sic] job. Please understand that we are not stating that your conditions did not exist, but that the objective clinical evidence on file is not supportive of functional impairment to the degree that you would have been unable to work." (*Id.*)

On July 24, 2015, LINA denied Dawson's claim for benefits under the LD Plan. (Pl's Statement ¶ 17.) The denial letter noted that Dawson's position of CTC Nurse Case Manager was considered a "Light level occupation" and that she had been out of work due to injuries from the wheel chair accident as well as general anxiety disorder. (Admin. R. at 384, ECF No. 22-1.) The letter stated that a peer review of Dawson's medical records performed on July 28, 2014 opined that there was "no evidence of any injury sustained on July 10, 2014, other than contusions to the lower legs and ankles." (*Id.*) The letter summarized the information from Dawson's treating physicians that was set forth in the letters denying Dawson's claims for SD benefits. (*Id.* at 384-85.) In addition, the letter stated that a Behavioral Health Specialist reviewed the notes from Dawson's visit to Dr. Kelly Van Norton, but that clarification was needed from Dr. Van Norton. (*Id.* at 385.) The Behavioral Health Specialist contacted Dr. Van Norton's office but had not received a response at the time the denial letter was issued. (*Id.*) The letter stated that a Nurse Case Manager, the Physical Medicine Medical Director, a Behavioral Health Specialist, and the

Psychiatric Medical Director reviewed Dawson's entire claim file, and that the outcome of the reviews "recommended that the medical records provided by your Health Care Professionals lack quantifiable, objective clinical exam findings, testing, or imaging that show a physical or psychiatric functional impairment that would preclude you from working in your own light occupation through the Elimination Period. . . ." (*Id.*)

Dawson appealed the denial of benefits under the LD Plan. (Pl.'s Statement ¶ 18.) By letter dated June 8, 2016, LINA upheld its denial of benefits. (*Id.* ¶ 19.) The letter stated that Dawson's complete file was reviewed, without deference to prior reviews, by the Vocational Rehabilitation Department, an Appeal Specialist, and three peer reviewers: Dr. Chavez, Board Certified in Psychiatry; Dr. Nwaneshiudu, Board Certified in Occupational Medicine; and Dr. Kohan, Board Certified in Pain Medicine. (Admin. R. at 366, ECF No. 22-1.) The letter stated that the peer reviews were conducted "[i]n order to clarify the severity of Ms. Dawson [sic] complaints and how it precludes her from performing her own occupation." (*Id.*) In addition to the medical information summarized in previous denial letters, the June 8, 2016 letter included substantive information from the FCE and noted that Dawson had seen several additional doctors. (*Id.* at 366-67.)

The letter stated that the FCE was inconsistent with the findings documented by Dawson's treating physicians, and that although the evaluator opined that Dawson gave a full effort during the test, there were no notations of measured heart rate increases during reports of increased pain with the activities performed during the evaluation. (*Id.* at 368.) The letter further noted that after reviewing her claim file and unsuccessfully attempting to contact Dawson's treating physicians, Dr. Nwaneshiudu and Dr. Kohan opined that Dawson's work restrictions were not supported. (*Id.* at 366.) Dr. Chavez's review found that Dawson's records contained no evidence to support psychiatric impairment which would limit or restrict Dawson from working. (*Id.* at 367.) In particular, the letter noted that Dr. Van Norton diagnosed Dawson with general anxiety disorder, but that Dawson's global assessment of functioning score indicated mild impairment in occupational and social settings. (*Id.* at 368.) Dr. Van Norton's records showed that Dawson had good judgment and fair insight, and a June 22, 2015 mental status exam showed that Dawson was alert and oriented. (*Id.*) The letter concluded,

> Please understand that a diagnosis and treatment alone does not equal a functional loss, [our] office must be provided with ongoing measurable exam findings that would support the severity of Ms. Dawson's function. Although Dr. Prentice [sic] advised on March

17, 2015 that the patient has an impairment rating of 19 percent, our office has nothing to support functional loss from when Ms. Dawson went out of work in July of 2014 to the March 17 evaluation or beyond.

(*Id.*)

Dawson filed this lawsuit on August 15, 2016. (*Id.* ¶ 21.) Dawson asserts that the Defendants wrongfully terminated her claim for benefits under the SD Plan and LD Plans and seeks the payment of the benefits allegedly due to her, an order declaring that she is entitled to immediate reinstatement of benefits under both plans, and payment of attorneys' fees and costs. (Compl. at 8, 10-11, ECF No. 1.) In the alternative, Dawson seeks an order remanding her claim to the claims administrator to the extent any new facts or submissions are to be considered. (*Id.* at 8, 11.)

The Defendants have asserted a counter-claim, alleging that the SD Plan allowed the Defendants to reduce disability benefits by the amount of Dawson's other sources of income, including workers' compensation. (Answer ¶¶ 8-9, ECF No. 11.) Dawson does not dispute that she received workers' compensation payments of $637.50 from April 2015 through June 2015 and that her benefits under the SD Plan were not reduced by the amount of the payments. (Def.'s Statement ¶¶ 38-39; *see* Pl.'s Resp. to Def.'s Statement of Material Facts, ECF No. 28.) Therefore, the Defendants seek to recover the benefits that were overpaid to Dawson. (*Id.* ¶ 11.)

## 2. Legal Standard

Although this matter is before the Court on cross-motions for summary judgment, in an ERISA benefits denial case "the district court sits more as an appellate tribunal than as a trial court." *See Curran v. Kemper Nat. Servs., Inc.,* No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting *Leahy v. Raytheon Co.,* 315 F.3d 11, 17-18 (1st Cir.2002)). The court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id.* Thus, there "may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would." *Pinto v. Aetna Life Ins. Co.,* No. 09-01893, 2011 WL 536443, at *8 (M.D. Fla. Feb. 15, 2011); *Turner v. Am. Airlines, Inc.,* No. 10-80623, 2011 WL 1542078, at *4 (S.D. Fla. Apr. 21, 2011) (Hurley, J.) ("[W]here, as here, the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the

legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.") (internal quotations omitted).

Under 29 U.S.C. § 1132(a)(1)(B), a benefit plan participant or beneficiary may bring a civil action to recover benefits due to her under the terms of the plan, and to enforce or clarify her rights under the terms of the plan. The provision does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Where a plaintiff challenges a denial of benefits under § 1132(a)(1)(B), a court must review the denial "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

The Eleventh Circuit has developed a multi-step framework for analyzing an administrator's benefits determination:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether [the administrator] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then [end the inquiry and affirm the decision].

*See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195-96 (11th Cir. 2010). If the claim administrator operated under a conflict of interest, the conflict of interest is "a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at 1197 (citations omitted). The burden is on the plaintiff to show that the denial of benefits was arbitrary. *Id.*

### 3. Analysis of the Benefits-Denial Decisions

#### A. Standard of Review

The first issue that the Court must address is whether LINA was vested with discretion in reviewing Dawson's claims for benefits under the plans. If LINA had discretionary authority, then the ultimate question would be whether reasonable grounds supported that decision; in other words, whether LINA's decision was arbitrary and capricious. *Capone*, 592 F.3d 1195. The Eleventh Circuit has held that *de novo* review is necessary "unless the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) (emphasis in original) (citations omitted).

Dawson admits that, under the LD Plan, LINA was vested with discretion in reviewing Dawson's claims for benefits. (Pl.'s Mot. for Summ. J. at 13.) Therefore, the Court will apply the arbitrary and capricious standard of review to the decision to deny benefits under the LD Plan. However, Dawson asserts that the Court should conduct a *de novo* review of LINA's decision to deny benefits under the SD Plan. (*Id.* at 5-6.) The only document in the Administrative Record that details the SD Plan benefits is the Summary Plan Description. (Pl.'s Mot. for Summ. J. at 5.)

ERISA requires the issuance of summary plan descriptions, and requires such descriptions to be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). Here, the Summary Plan Description identifies the Benefit Administrator as Disability Management Solutions, and further states that "[t]he Benefit Administrator has the sole discretion to determine whether you are eligible for benefits under the CIGNA Short-Term Disability Plan and the amount of any benefit to which you might be entitled, as well as to interpret any of the plan's provisions, including ambiguous and disputed terms and to make any related factual determinations.". (Admin. R. at 14, ECF No. 22-1.)

Dawson argues that the Court should apply a *de novo* review to LINA's decision because the Summary Plan Description cannot effectively grant discretionary authority to LINA. (*Id.*) In support of her position, Dawson cites to *Wilson v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses, Walgreen, Co.*, 942 F.Supp.2d 1213, 1249-50 (M.D. Fla. 2013), which held that a summary plan description was insufficient to establish that an employee benefit plan vested discretion with the claims administrator. The *Wilson* court relied in part on the fact that the summary plan description at

issue did not contain all of the elements that ERISA requires of employee benefit plans. *Id.*

However, a subsequent case, also from the Middle District of Florida, disagreed with *Wilson*, noting that the weight of authority is contrary to *Wilson's* holding. *Cramasta v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses*, No. 8:12-cv-1451, 2013 WL 12157138, *10 (M.D. Fla. Nov. 25, 2015) (citations omitted). In *Cramasta*, the court held that the summary plan description was sufficient to confer discretion on the plan administrator, relying on the fact that the summary plan description stated that it was the "official. . .governing document for purposes of describing the various plan provisions," and that the summary plan description was the only document that existed describing the plan provisions. *Id.* at *11. In this district, Judge Gold found that a summary plan description was sufficient to vest the plan administrator with discretion in part because the summary plan description stated that the plan administrator had discretion and authority to resolve questions concerning eligibility and benefit determinations. *See Luton v. Prudential Ins. Co. of America*, 88 F.Supp.2d 1364, 1370 (S.D. Fla. 2000).

The Defendants argue that the Summary Plan Description contains all of the elements that ERISA requires of employee benefit plan documents and has express language conferring discretion on LINA through Disability Management Solutions. (Def.'s Resp. to Pl.'s Mot. for Summ. J. at 3, ECF No. 30.) The Defendants have submitted a declaration from Richard Lodi, a Senior Operations Representative for LINA, which states that Disability Management Solutions is a service mark licensed for use by LINA. (*Id.* Ex. A. ¶ 4.) In addition, the declaration states that "Cigna Corporation does not have a separate plan document for its STD plan; the 2006 summary plan description and the 2009 update constitute the entire STD legal plan document in effect in 2014." (*Id.* ¶ 5.)

Dawson has not disputed that the Summary Plan Description meets ERISA's requirements for legal plan documents. (*See* Pl.'s Reply to Def.'s Opp, ECF No. 34.) Rather, Dawson argues that Lodi's declaration should be stricken because it is "extraneous to the Administrative Record." (*Id.* at 2.) Review of a plan administrator's denial of benefits is typically limited to consideration of the material available to the administrator at the time it made its decision. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989). However, this does not mean that the Court cannot consider Lodi's declaration in determining whether LINA was vested with discretion under the SD Plan. Indeed, one of the cases to which Dawson cites recognizes that courts may consider evidence outside of the administrative record that is "related to

either interpreting the plan or explaining medical terms and procedures relating to the claim." *Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999), *overruled on other grounds by Burell v. Prudential Ins. Co. of America*, 820 F.3d 132 (5th Cir. 2016). Lodi's declaration does not concern the substance of the benefits-denial decision. Therefore, the Court declines to strike the declaration because it provides information that is important for the Court to consider in interpreting the legal significance of the Summary Plan Description.

The Court notes that the Plaintiff also cites to *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) in support of her position that a *de novo* review is required. (Pl.'s Reply at 3, ECF No. 34.) In *CIGNA*, the Supreme Court held that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B). *Id.* at 438 (emphasis in original). Section 502(a)(1)(B) is the statutory provision that provides for a private right of action for beneficiaries to enforce their rights under the terms of a benefit plan. As an initial matter, the Court notes that a holding that a summary plan description cannot serve as the basis for legally enforcing the terms of a benefit plan is different from a holding that the summary plan description cannot provide evidence that the plan vests the administrator discretionary with discretion. Moreover, under *CIGNA*'s holding, Dawson has no basis on which to enforce her rights because without the Summary Plan Description, there is no evidence in the record of the terms of the SD Plan. Indeed, Dawson specifically relies on the Summary Plan Description as evidence of various terms of the plan. (*See* Pl.'s Mot. for Summ. J. at 2; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 2, 5.) Dawson cannot have it both ways; either the Summary Plan Description is sufficient evidence of the terms of the plan or it is not.

Since Dawson has not disputed that the Summary Plan Description conforms to ERISA's requirements for legal plan documents, the Defendants have provided a declaration stating that the Summary Plan Description was the only legal plan document in effect in 2014, and the Summary Plan Description expressly grants the plan administrator discretionary authority to make eligibility determinations and to construe the plan's terms, the Court finds that LINA was vested with discretion in reviewing claims under the SD Plan. Accordingly, the Court will review LINA's denial of benefits under both the SD Plan and LD Plan under the abuse of discretion standard. *See Capone*, 592 F.3d at 1195.

**B. Reasonableness of the Denial of Short Term Disability Benefits**

The Court will first address Dawson's arguments that LINA's decision to deny benefits under the SD Plan was substantively unreasonable, and will then address Dawson's arguments that LINA committed procedural errors that rendered its decision unreasonable.

### *(1) The Substantive Benefits-Denial Decision*

Dawson asserts that her claim for benefits under the SD Plan was supported by sufficient proof. However, that is not the question before the Court. The Court must determine whether LINA's decision was supported by reasonable grounds. *Capone*, 592 F.3d at 1195-96. "A reasonable determination is not necessarily the 'best' determination, or even the result the Court would have reached . . . . Thus, even if there is evidence that would support a contrary decision, the Court must accord deference to the administrator's decision if reasonable." *Bloom v. Hartford Life and Acc. Ins. Co.*, 917 F.Supp.2d 1269, 1285 (S.D. Fla. 2013) (Ryskamp, J.) (internal quotations and citations omitted).

In addition to the inconsistencies described in the three letters that LINA sent to Dawson denying her claim for benefits under the SD Plan, the reports from Dawson's treating physicians contain additional conflicting information concerning Dawson's symptoms and the severity of her injuries. For example, eleven days after the accident, Dawson saw Dr. Clark McKeever, who noted that the x-rays from the urgent care center showed no evidence of swelling, fractures, or misalignment in Dawson's feet, and that his "[i]mpression was that both feet were within normal limits." (Admin. R. at 327, ECF No. 22-2.) Dr. McKeever observed that the examination was "difficult as the patient was constantly moving her arms and her feet to relieve 'pain.' The objective findings were out of keeping with subjective complaints." (*Id.* at 329.)

Dr. Berliner's October 10, 2014 orthopedic evaluation report included a detailed recitation of Dawson's medical history since the date of her accident. (*Id.* at 341-42, ECF No. 22-2.) Dr. Berliner noted that Dawson visited an emergency room on July 14, 2014, and that the doctor that examined her observed that she had no skin lesions, that her back range of motion was normal, and that her straight leg raise was negative. (*Id.* at 341.) On August 14, 2014, Dawson went to the emergency room again, but Dr. Berliner noted that "something must have struck the doctor as being odd, because the emergency room doctor reviewed the surveillance video of the urgent care facility and states that the patient was walking without difficulty upon arrival at the emergency care center. She was diagnosed with 'pain of unknown etiology.'" (*Id.*) Dr. Berliner observed that "There is a lot about the patient's presentation

that does not make sense. However, there are a few that do." (*Id.* at 343.) Dr. Berliner found that "[t]he crush to her feet clearly was not terribly severe." (*Id.* at 344.) Dr. Berliner noted that he was unable "to do any type of reasonable exam on the patient," and then listed the injuries that he believed she "most likely suffered." (*Id.* at 409.) He found that Dawson would benefit from physical therapy, but stated that "[t]here is a certain amount of symptom magnification going on with this patient, and unfortunately it is preventing her caregivers from taking her seriously . . . ." (*Id.* at 344.) He found that there was no need for a further follow-up consultation. (*Id.*)

Dr. Prentice's notes from his October 14, 2014 evaluation noted that Dawson went to an emergency room on August 14, 2014. (*Id.* at 413.) At the emergency room, she "was diagnosed with leg contusions and was unhappy with the diagnosis." (*Id.*) Dr. Prentice's examination noted that Dawson was "in no obvious discomfort or distress," and that she was wearing an elastic knee brace on her left knee and a mechanical brace on her right knee that she stated she had received from friends. (*Id.*) Dr. Prentice diagnosed Dawson with leg and ankle contusions and recommended physical therapy. (*Id.* at 414.)

In addition to the inconsistencies in the doctors' reports concerning Dawson's physical symptoms and level of impairment, beginning in September 2016, Dawson's treating physicians were largely unable to conduct physical examinations of Dawson's injuries due to her reports of pain. Dawson argues that the Defendants should have accorded greater weight to her pain. (*See, e.g.,* Pl.'s Mot. for Summ. J at 12.) The Plaintiff cites to *Oliver v. Coca Cola, Co.*, 497 F.3d 1181 (11th Cir. 2007), *overruled on other grounds by Oliver v. Coca Cola Co.*, 506 F.3d 1316 (11th Cir. 2007), for the proposition that pain-related disabilities such as fibromyalgia or chronic pain syndrome may not be subject to diagnosis by objective laboratory tests. However, in *Oliver* the benefits plan at issue did not require objective evidence of a claimant's disability. *Id.* at 1196. Furthermore, the claimant's physicians "concluded unequivocally that he could not work," the claimant provided "medical reports from multiple physicians stating that his reports of pain were consistent with their diagnoses and did not appear to be histrionic or exaggerated," and the claimant submitted a report from a physician that "addressed how [the plaintiff's] disability related specifically to the various tasks required of him as a Systems Support Specialist, and concluded that he could not perform those tasks." *Id.* at 1196-97 (internal quotations and citations omitted); *see also Lee v. BellSouth Telecomm., Inc.*, 318 Fed. App'x. 829, 837-38 (11th Cir. 2009) (citations omitted) (holding that benefits denial decisions based on lack of objective evidence was arbitrary and capricious when multiple physicians "repeatedly

confirm that [the plaintiff] suffered from extreme and wholly debilitating chronic. . .pain that was manifested in obvious physical symptoms")

Unlike *Oliver,* Dawson's physicians did not conclude unequivocally that she could not work and did not consistently conclude that her subjective complaints were consistent with their objective findings. A plan administrator is entitled to give different weight to the opinions of independent medical professionals and a claimant's treating physicians, and is entitled to discount opinions offered by treating physicians when those opinions are conflicting or inconsistent. *Blankenship,* 644 F.3d at 1356. In addition, even "where a condition is subjective in nature, 'it is reasonable to expect objective medical evidence of an inability to work.'" *Bloom,* 917 F.Supp.2d at 1282 (quoting *Creel v. Wachovia Corp.,* No. 08-10961, 2009 WL 179584, *9 (11th Cir. Jan. 27, 2009).

Dawson relies heavily on the fact that Dr. Davis and Dr. Berliner completed Texas Workers' Compensation Work Status Reports stating that Dawson was unable to return to work, but the physicians merely checked a box on the forms stating that Dawson was unable to work. (*See, e.g.*, Admin. R. at 340, ECF No. 22-2.) The SD Plan requires objective medical evidence to support a doctor's assessment, and therefore it is the doctors' reports that carry the most weight under the plan. Dawson alleges that the Defendants overlooked the following objective evidence that supported her inability to work: (1) Dr. Train's July 25, 2014 medical request form; (2) the nerve conduction velocity testing dated December 5, 2014, and (3) the FCE. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 2, ECF No. 27.) Dr. Train's July 25, 2014 request form was during the period that the Defendants paid SD benefits to Dawson, and does not provide objective evidence of Dawson's functional losses after September 6, 2014, the effective date for the denial of Dawson's SD benefits. Although the December 5, 2014 nerve conduction velocity testing showed abnormal nerve conduction velocities (Admin. R. at 535, ECF No. 22-2), a December 1, 2014 nerve conduction velocity test showed that all nerves were within normal limits. (Admin. R. at 527, ECF No. 22-3.) In light of these inconsistent results, the Court cannot say that LINA's decision to discount the December 5, 2014 test was unreasonable.

The FCE report stated that Dawson was unable to return to work, and noted that she was unable to perform or had difficulty performing many of the tasks included in the evaluation, resulting in a physical demand level assessment of "less than sedentary." (*Id.*) The June 10, 2015 denial letter noted that the FCE was dated January 8, 2014, which was prior to Dawson's injuries. (Admin. R. at 465, ECF No. 22-1.) Dawson argues that the January 8, 2014 date is a scrivener's error, and that "anyone who actually reviewed the

report would quickly and clearly realize that this date was in error and should actually have been January 8, 2015." (Pl.'s Mot. for Summ. J. at 7.)

When conducting a review of an ERISA benefits denial, "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (internal quotations and citations omitted). The burden is on the claimant "to obtain evidence to prove her disability at the time of the administrator's review." *Bloom*, 917 F.Supp.2d at 1279 (citing *Glazer*, 524 F.3d at 1247. There is no dispute that the report was dated January 8, 2014, and Dawson has made no assertions that she attempted to correct the date on the report or provide information validating the date of the report to LINA.

The Defendants argue that even if the FCE was considered, its findings were inconsistent with the assessments of Dawson's other physicians. (Def.'s Resp. in Opp. to Pl.'s Mot. at 5-6, ECF No. 30.) The Supreme Court has held that ERISA does not require plan administrators "automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). LINA did substantively consider the FCE in its June 8, 2016 decision upholding the denial of Dawson's claim for benefits under the LD plan and found that the results were inconsistent with the evaluations of Dawson's treating physicians. (Admin. R. at 368, ECF No. 22-1.) In light of the incorrect date on the FCE and the fact that LINA otherwise had a reasonable basis for its decision, the Court cannot say that the failure to substantively consider the FCE made LINA's decision arbitrary and capricious.

Dawson also argues that a January 20, 2015 review of Dawson's file by Associate Medical Director Nick Ghaphery, and a June 10, 2015 review of Dawson's file by Associate Medical Director Paul Seiferth were improper because the notes from those reviews failed to appropriately address all of the relevant medical information, and, in the case of Dr. Ghaphery's review, failed to provide an opinion regarding Dawson's restrictions and limitations. (Pl.'s Mot. for Summ. J. at 13-14.) However, these two individuals were not providing peer reviews; they were two of several LINA employees assigned to review Dawson's appeals. Their reports are titled "Internal Resource Referrals." (Admin. R. at 179, 200, ECF No. 22-1.) Since multiple employees reviewed each of Dawson's appeals and the denial letters set forth detailed explanations of the reasons for LINA's decisions to deny Dawson's appeals, Dawson has not

sufficiently explained how notes from two internal reviews could render the final, comprehensive determination arbitrary and capricious.

In light of the foregoing, LINA's decision to deny benefits under the SD Plan was not arbitrary and capricious. *See Torres v. Prudential Ins. Co. of America*, 2012 WL 3001156, No. 11-61605, at *4 (S.D. Fla. July 23, 2012) (upholding benefits-denial decision because there was nothing in the claimant's medical records to support a conclusion that, as a result of her medical conditions, she was unable to perform the material and substantial duties of her job) (Scola, J.). While it appears that Dawson had at least some physical symptoms after her accident and a great deal of subjectively reported pain, LINA's determination that Dawson failed to provide sufficient objective medical evidence of functional losses or an inability to perform her job was supported by reasonable grounds.

### (2) Alleged Procedural Violations

Dawson alleges that the Defendants failed to perform a full and fair review of her claim for SD benefits due to three procedural errors. First, Dawson argues that LINA "relied exclusively upon internal incomplete Claim File Reviews by its own employees." (Pl.'s Mot. for Summ. J. at 10.) However, the Eleventh Circuit has held that the use of file reviews by independent doctors, as opposed to "live, physical examinations" is not evidence that a plan administrator acted arbitrarily and capriciously, "particularly in the absence of other troubling evidence." *Blankenship*, 644 F.3d at 1357 (citing *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)). Dawson also alleges that each of the Defendants' reviews "appears to have been summarily performed within a matter of minutes." (Pl.'s Mot. for Summ. J. at 13.) However, Dawson provides no evidence to support this statement and the length of time that a plan administrator spends reviewing a file is not evidence in and of itself that the decision was arbitrary and capricious.

Second, Dawson asserts that it was improper for the Defendants to refer Dawson's October 22, 2014 appeal to Heidi Hodge, a Nurse Care Manager, since she was involved with the initial denial of Dawson's claim. (*Id.* at 11.) 29 C.F.R. § 2560.503-1(h)(3) requires that a health care professional who is consulted in connection with an adverse benefit determination shall not be an individual who was consulted in connection with the determination that is the subject of the appeal. Dawson alleges that there was a potential conflict of interest because "Cigna is evaluating eligibility for SD benefits for one of its own Cigna employees." (*Id.*) However, LINA made the eligibility determination. It is not clear to the Court whether Hodge was employed by LINA or by Cigna.

The January 21, 2015 denial letter states that an Appeal Senior Associate and a Medical Director reviewed Dawson's complete file. (Admin. R. at 477, ECF No. 22-1.) Furthermore, Dawson does not allege that Hodge was involved with the review of her second appeal, which was reviewed by a Medical Director. (*Id.* at 465, ECF No. 22-1.) Therefore, since multiple individuals reviewed each of Dawson's appeals and Dawson has not alleged that Hodge was actually biased or unable to properly complete a review of Dawson's claim, Dawson has not sufficiently established that Hodge's involvement deprived Dawson of a full and fair review of her claim such that it would render LINA's benefits-denial decision arbitrary and capricious. *See Bloom*, 917 F.Supp.2d at 1285 (holding that a benefits-denial decision was not arbitrary and capricious in part "[b]ecause the Court does not find the procedural irregularities surrounding [the plaintiff's] benefits determination to amount to a deprivation of a full and fair review of her claim").

Finally, Dawson alleges that the initial letter denying her claim for SD benefits failed to specify the additional information that Dawson needed to provide in order to perfect her claim. (Pl.'s Mot. for Summ. J. at 11.) 29 C.F.R. § 2560.503-1(g)(1)(iii) requires that a notification of an adverse benefit determination must include "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." The initial denial letter stated that "the medical information received does not support how you are unable to perform your light occupation as a Nurse Case Manager beyond September 6, 2014." (Admin. R. at 488, ECF No. 22-1.) In addition, the letter stated that Dawson could appeal the denial and submit additional information, including "medical records from your doctor and/or hospital, test result reports, therapy notes, etc. These medical records should cover the time period of September 7, 2014 through present." (*Id.* at 488-89.) Thus, the letter informed Dawson why the medical information that she provided was deficient and included a list of additional information that she could provide. The Court does not find that the language used in the letter amounted to a deprivation of a full and fair review of Dawson's claim.

### C. Reasonableness of the Denial of Long Term Disability Benefits

Due to the Elimination Period, Dawson would only be entitled to LD benefits if she was entitled to SD benefits for a period of 26 weeks in any 12-month period. (Admin. R. at 40-41, ECF No. 22-1.) Since the Court has found that the Defendants' decision to deny SD benefits was supported by reasonable grounds, Dawson was not entitled to LD benefits. Nevertheless, out of an abundance of caution, the Court will address Dawson's arguments that LINA's

decision to deny her claim for benefits under the LD plan was arbitrary and capricious. Dawson argues that LINA's decision to deny her claim was arbitrary and capricious for three reasons: (1) LINA applied a light duty occupational standard when Dawson's occupation was medium duty; (2) Dawson provided sufficient proof in support of her claim and LINA failed to conduct a reasonable review of Dawson's medical records; and (3) LINA failed to perform an independent medical evaluation. (*Id.* at 14.) Dawson also notes that LINA operated under a conflict of interest. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9, ECF No. 27.)

### *(1) Application of a Light Duty Standard*

The LD Plan stated that in evaluating an employee's disability, "the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy." (Admin. R. at 59, ECF No. 22-1.) LINA determined that Dawson's occupational duties constituted a "[l]ight level occupation as defined by the Dictionary of Occupational Titles, a Federal publication." (*Id.* at 384). Dawson alleges that LINA "intentionally manipulated the DOT classification of job strength. . .from 'Medium' to 'Light' duty." (Pl.'s Mot. for Summ. J. at 14-15.) Dawson cites to a document titled "Occupational Description" in the Administrative Record, which is apparently from the Dictionary of Occupational Titles ("DOT"). (Admin. R. at 523-24, ECF No. 22-2.") The job title on the document is "Nurse, General Duty," it lists the tasks typically performed by a nurse, and indicates that the required strength is "Medium." (*Id.*) The word "Medium" is crossed out, and "LIGHT" is handwritten on the document. (*Id.* at 524.)

The Defendants assert that "Nurse, General Duty" was the best general equivalent to Dawson's position, which was CTC Nurse Case Manager. (Def.'s Opp. in Resp. to Pl.'s Mot. for Summ. J. at 8-9.) However, the Defendants assert that none of the four tasks listed on the Occupational Description document were actually performed by Dawson, and Dawson's duties did not include any hands-on patient care. (*Id.* at 9.) In describing Dawson's job duties, the Plaintiff's Statement of Material Facts cites to Dawson's job description provided by Cigna. (Pl.'s Statement of Material Facts ¶¶ 6-7.) That job description states that Dawson was responsible for planning, implementing, and evaluating appropriate health care services in conjunction with physician treatment plans, among other things. (Admin. R. at 528, ECF No. 22-2.) The job description includes performing "telephonic outreach or home visits as needed." (*Id.* at 529.) This is consistent with the Plaintiff's own description of her job duties. (Pl.'s Statement of Material Facts ¶¶ 6-7.) The July 24, 2015 denial letter listed the DOT requirements for "light level occupations" and

determined that Dawson's position as a CTC Nurse Care Manager met that definition. (*Id.* at 384, ECF No. 22-1.)

Other than the fact that the DOT classification for a "Nurse, General Duty," was included in Dawson's claim file, the Plaintiffs have not provided any rationale why Dawson's duties should have been classified as medium duty. The Defendants are correct that Dawson's job description did not include any of the tasks listed on the Occupational Description for "Nurse, General Duty." Moreover, the LD Plan did not mandate that the Defendants use the DOT classifications. Rather, the LD Plan stated that "the Insurance Company will *consider* the duties of the occupation as it is normally performed in the general labor market in the national economy." (Admin. R. at 59, ECF No. 22-1.) (emphasis added). Dawson has not made any attempt to show that the job duties that Dawson actually performed as a CTC Nurse Care Manager met the DOT classification for medium strength jobs. Therefore, Dawson has not met her burden of demonstrating that the classification of her job rendered LINA's decision arbitrary and capricious.

### (2) Reasonableness of the Benefits-Denial Decision

Dawson next argues that the benefits denial decision was arbitrary and capricious because six different medical professionals "provided restrictions and limitations that prevent her from being able to perform all the material duties of her Regular Occupation or a Qualified Alternative," and LINA wrongfully relied on peer reviews. (Pl.'s Mot. for Summ. J. at 15-16.) As an initial matter, the Court notes that Dawson does not dispute that the peer review conducted by Dr. Chavez correctly found that Dawson was not mentally, cognitively, or behaviorally impaired. (*Id.* at 17.) However, Dawson disputes the findings of the other two peer reviewers, Dr. Nwaneshiudu and Dr. Kohan.

Dawson primarily relies on reports from her treating physicians from 2015-2016 that found that she was unable to return to work, or was only able to return to work with restrictions. (*Id.* at 15.) However, as noted above, the Elimination Period required that Dawson receive 26 weeks of SD benefits in order to be eligible for LD benefits, and therefore the reports from Dawson's treating physicians in 2015 and 2016 do not constitute evidence of Dawson's functional losses dating back to July 11, 2014. Furthermore, as discussed above, Dawson's treating physicians expressed inconsistent findings about her physical symptoms and level of impairment, particularly in the time frame of September through December of 2014.

The Court notes that even the treating physicians that at times opined that Dawson could not work or could only work with restrictions, at other times opined that she could return to work with no restrictions. For example,

Dawson argues that Dr. Davis completed multiple Texas Workers' Compensation Work Status Reports throughout 2015 that stated that Dawson could return to work with restrictions that would have prevented Dawson from performing her duties. (Pl.'s Mot. for Summ. J. at 15, ECF No. 25.) However, Dr. Nwaneshiudu noted that Dr. Davis opined that Dawson could return to work *without* restrictions from April 10, 2015 through May 26, 2015, and that on July 8, 2016, Dr. Davis submitted a report that did not give any specific restrictions but noted that Dawson's medications could cause drowsiness. (Admin. R. at 555, ECF No. 22-2.) When Dr. Nwaneshiudu contacted Dr. Davis, she said that she had not seen Dawson since June 2015 and "could not comment on the claimant's functional limitation." (*Id.* at 557.) Dr. Nwaneshiudu found, among other things, that:

> [T]here is insufficient evidence that shows the claimant is physically functionally impaired . . . there is inconsistent evidence of functional limitations noted by her treating providers, she is consistently noted to have subjective complaints of muscle tenderness, which correlates with her diagnosis of fibromyalgia. Her most recent MRI scan of the lumbar spine, showed no significant pathology and no evidence of compression, which does not correlate, with her subjective symptoms of radiculopathy.

(Admin. R. at 558, ECF No. 22-2.)

Dr. Kohan's peer review specifically cited to Dr. McKeever's July 21, 2014 evaluation, Dr. Prentice's October 14, 2014 evaluation, Dr. Berliner's October 10, 2014 evaluation, the FCE, Dr. Davis's July 8, 2015 medical request form, and Dr. Peer's July 8, 2015 medical request form. (Admin. R. at 539, ECF No. 22-2.) Dr. Kohan found that the FCE results were "not consistent with other physical exam findings that did not identify any substantial motor weakness, loss of range of motion, or other concerning provocative findings as of 07/11/14 that would correlate with the functional capacity evaluation results." (*Id.*) Dr. Kohan concluded that although Dawson had been followed for "primarily subjective complaints," the records did not show any "obvious signs of sedation or significant side effects with prescribed medications. The records did not demonstrate any significant motor weakness, loss of range of motion, or any ongoing provocative findings to the extent that the claimant reasonably required specific restrictions and/or limitations as of 07/11/14 to the present time." (*Id.*)

Dawson argues that the short length of Dr. Kohan's analysis and his reliance on three "random" medical reports demonstrate that his analysis was unreasonable. (Pl.'s Mot. for Summ. J. at 17, ECF No. 25.) The "random"

medical reports referenced by Dawson are reports from Dawson's own treating physicians. In addition, the length of the analysis does not automatically mean that it is arbitrary and capricious. As noted above, the Supreme Court has held that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker*, 538 U.S. at 834.

Based on the foregoing, there was a reasonable basis for LINA to determine that Dawson simply had not provided sufficient evidence that she satisfied the Elimination Period and had not provided sufficient evidence of her inability to perform "all the material duties" of her position as a CTC Nurse Care Manager.

### (3) Failure to perform an independent medical examination

The June 8, 2016 denial letter, which was addressed to Dawson's counsel, stated that LINA had "requested if you would consider our office sending Ms. Dawson for an Independent [M]edical Examination, as noted in the January 19, 2016 Appeal letter. However, May 24, 2016 declined our offer to have Ms. Dawson [sic] exam, so our office made our determination based on the medical information contained within her claim file." (Admin. R. at 368, ECF No. 22-1.) Dawson argues that there is no written documentation of the request or the response to the request. (Pl.'s Mot. for Summ. J. at 19.) However, Dawson argues that even if LINA requested an independent medical examination and Dawson declined, LINA did not request the examination until 125 days after the administrative appeal was filed. (*Id.*) Since ERISA permits a plan administrator 45 days to answer an appeal and one extension of 45 days, Dawson argues that the untimeliness of the request for the examination is another example of how LINA's review was arbitrary and capricious. (*Id.*)

If LINA did in fact request permission to conduct an independent medical examination, the Court fails to see how such a request, even if untimely, could make the decision arbitrary and capricious. If anything, it demonstrates that LINA attempted to obtain evidence to support Ms. Dawson's inability to perform the duties of her job. If LINA did not in fact request the examination, Dawson has pointed to no requirement of the LD Plan or the relevant case law that required LINA to perform an independent medical examination. Thus, neither scenario renders the benefits-denial decision arbitrary and capricious.

### (4) Conflict of Interest

Since LINA determines whether an employee is eligible for benefits and also pays the benefits out of its own funds, it operates under a conflict of interest. (Def.'s Mot. for Summ. J. at 1, ECF No. 23.); *Blankenship*, 644 F.3d at

1355 (citations omitted) (a "pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds"). The conflict of interest is a factor that the Court must consider in reviewing LINA's benefits-denial decision. *Capone*, 592 F.3d at 1196. Despite the conflict of interest, it is the plaintiff's burden to show that LINA's decision was arbitrary and capricious; "it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* (quoting *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008)). The effect that a conflict of interest will have in any given case varies "according to the severity of the conflict and the nature of the case: we look to the conflict's 'inherent or case-specific importance.'" *Blankenship*, 644 F.3d at 1355 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-119 (2008)) (further noting that while courts must account for a conflict of interest, the "basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision").

The only substantive allegation that Dawson makes concerning LINA's conflict of interest is that the conflict of interest is "likely why LINA relied solely on biased reviews of its own employees and commissioned the reviews of Drs. Nwaneshiudu and Kohan, who document an open hostility toward individuals claiming disability due to fibromyalgia and pain claims." (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9, ECF No. 27.) However, Drs. Nwaneshiudu and Kohan were independent doctors hired by LINA to perform peer reviews (cite). Their reviews do not demonstrate an "open hostility" toward individuals claiming disability due to fibromyalgia and pain claims. Moreover, Dawson has made no substantive allegations demonstrating that LINA's employees were biased. There were reasonable grounds to support LINA's decisions to deny benefits under the LD Plan, and Dawson has not demonstrated that the decision was arbitrary and capricious as a result of the conflict of interest.

## 4. Analysis of the Defendants' Counter-Claim

### A. Legal Standard

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir.

2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586.

### B. Analysis

The Summary Plan Description of the SD Plan states that benefits under the plan will be reduced by the amount of any workers' compensation payable for injury or sickness arising out of work with Cigna. (Admin. R. at 9, 31, ECF No. 22-1.) The Defendants allege that Dawson received $637.50 in workers' compensation payments from April 2015 through June 1015. (Def.'s Statement of Material Facts ¶ 38, ECF No. 24.) The Defendants assert that, pursuant to the SD Plan, Cigna is entitled to recover the amount of the workers' compensation payments. (*Id.* ¶ 40.)

Dawson's sole argument in response to the Defendants' motion for summary judgment is that since the SD Plan is not in the Administrative Record, the Defendants have not proven that they are entitled to offset SD benefits by the amount of the workers' compensation that Dawson received. (Pl.'s Resp. to Def.'s Mot. for Summary J. at 9, ECF No. 27.) However, as explained above, the Defendants have provided a declaration stating that the Summary Plan Description was the only legal plan document in existence during the relevant time period. The Court has no reason to doubt that the Summary Plan Description accurately reflected the terms of the SD Plan, and Dawson has not disputed that she received workers' compensation payments in the amount of $637.50. (*See* Pl.'s Resp. to Def.'s Statement of Material Facts,

ECF No. 28.) Since Dawson has utterly failed to make any factual allegations demonstrating that there is a genuine issue for trial, the Defendants are entitled to summary judgment on their counter-claim.

## 5. Conclusion

Having considered the arguments of the parties, the record, and the relevant legal authorities, the Court finds that LINA's decisions to terminate Dawson's short term disability benefits and deny her claim for long term disability benefits were supported by reasonable grounds and were not arbitrary or capricious. In addition, the Court finds that the Defendants are entitled to summary judgment on their counter-claim. Therefore, the Court **denies** the Plaintiff's Motion for Summary Judgment (ECF No. 25) and **grants** the Defendants' Motion for Summary Judgment (ECF No. 23).

**Done and ordered** in chambers, at Miami, Florida, on May 31, 2017

Robert N. Scola, Jr.
United States District Judge